IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 125,104

STATE OF KANSAS,
*Appellee*,

v.

TODGE ANTON ANDERSON,
*Appellant.*

SYLLABUS BY THE COURT

1.

A district court's decision about whether to impose a sanction for a discovery violation, and which sanction to impose, is reviewed for an abuse of discretion so long as due process rights are not implicated. And generally, defendants do not have a due process right to have evidence excluded when a party violates a discovery order. An abuse of discretion occurs if the decision is arbitrary, fanciful, or unreasonable, or if it is based on an error of law or fact. The party asserting error has the burden to establish an abuse of discretion.

2.

K.S.A. 2022 Supp. 22-3212(a) requires that the prosecuting attorney permit the defense to inspect and copy certain evidence upon request by the defense. Thus, to establish a discovery violation under that statute, the record must show the defendant requested inspection or copies of the evidence at issue.

3.

K.S.A. 2022 Supp. 22-3212(i) grants the district court discretion to impose sanctions for violations of the criminal discovery statutes. Such sanctions may include

1

allowing the opposing party to inspect any materials not previously disclosed, ordering a continuance, excluding any materials not disclosed, or other orders the district court deems just under the circumstances.

4.

The trial court has wide discretion in deciding which, if any, sanctions to impose for a discovery violation. In reaching this decision, the trial court should consider the reasons why disclosure was not made, the extent of the prejudice, if any, to the opposing party, the feasibility of rectifying that prejudice by a continuance, and any other relevant circumstances. The court may also consider whether there are recurring problems or repeated instances of intentional failure to disclose or to abide by the court's discovery rulings. Ordinarily, the court should impose the least drastic sanctions which are designed to accomplish the objects of discovery but not to punish.

5.

Prosecutors generally have wide latitude in crafting arguments and commenting on the weaknesses of the defense. But an argument attempting to shift the burden of proof is improper. A prosecutor does not shift the burden of proof by pointing out a lack of evidence to support a defense or to corroborate a defendant's argument regarding holes in the State's case. Likewise, when the defense creates an inference that the State's evidence is not credible because the State failed to admit a certain piece of evidence, the State may rebut the inference by informing the jury that the defense has the power to introduce evidence. But when discussing the defense's subpoena power, the State crosses the line when it suggests the defendant must disprove the State's case or offer evidence to support a finding of reasonable doubt.

6.

The identity of a controlled substance may be proven by circumstantial evidence if that evidence supports a reasonable inference that the defendant distributed or possessed the substance in question.

7.

If convicted, K.S.A. 22-4513 provides that the district court shall tax defendant with all expenditures made by the State Board of Indigents' Defense Services to provide counsel and other defense services. In determining the amount and method of payment, district courts must explicitly consider two circumstances on the record:  (1) the financial resources of defendant; and (2) the nature of the burden that payment of the award will impose.

Appeal from Shawnee District Court; CHERYL A. RIOS, judge. Oral argument held September 12, 2023. Opinion filed March 1, 2024. Affirmed in part, vacated in part, and remanded with directions.

*Peter Maharry*, of Kansas Appellate Defender Office, argued the cause, and *Jennifer C. Bates*, of the same office, was with him on the brief for appellant.

*Michael R. Serra*, deputy district attorney, argued the cause, and *Michael F. Kagay*, district attorney, and *Kris W. Kobach*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

WALL, J.:  Todge Anton Anderson and two accomplices were involved in the robbery and murder of Christopher McMillon. Trial evidence showed Anderson had been dealing synthetic marijuana in the month before the murder. Anderson obtained his supply of synthetic marijuana from McMillon, but Anderson was in debt to McMillon for a certain quantity of this product. One evening, Anderson arrived at McMillon's home

with the two accomplices. Upon entering McMillon's home, Anderson fatally shot McMillon and directed the accomplices to take items of value from the residence.

A jury convicted Anderson of first-degree felony murder, second-degree intentional murder (as a lesser-included offense of first-degree premeditated murder), aggravated robbery, distributing or possessing with intent to distribute a controlled substance, and criminal possession of a weapon. Anderson was sentenced to a controlling term of life without the possibility of parole for 620 months and ordered to pay the State Board of Indigents' Defense Services (BIDS) $5,000 in attorney fees.

On direct appeal, Anderson raises four claims of error. First, Anderson argues the district court abused its discretion by admitting into evidence a recording of a jail call. In that recording, Anderson talked about getting shorted in a drug distribution operation. The State disclosed this recording days before the start of the trial. Anderson claims the State's late disclosure violated statutory rules of criminal discovery and the district court should have excluded the evidence as a sanction. But even assuming the late disclosure violated a discovery statute, the admission of the evidence was reasonable under the circumstances.

Second, Anderson argues the prosecutor erred in closing argument by shifting the burden of proof to Anderson. During rebuttal, the State mentioned Anderson's subpoena power in conjunction with the reasonable doubt standard and explained that Anderson had failed to produce a specific piece of evidence relevant to his defense. Collectively, these comments obscured how the burden of proof applied to one particular argument, but the error did not affect the trial's outcome.

Third, Anderson argues there was insufficient evidence to support his conviction for distributing synthetic marijuana or possessing synthetic marijuana with intent to

4

distribute in an amount less than 25 grams. But the trial evidence, when viewed in a light most favorable to the State, supports his conviction.

Finally, Anderson argues the district court erred by ordering him to pay $5,000 in BIDS attorney fees. Before imposing this obligation on a defendant, Kansas law requires that the district court explicitly consider on the record the nature of the burden such payment would impose on the defendant. See K.S.A. 22-4513(b); *State v. Robinson*, 281 Kan. 538, 546, 132 P.3d 934 (2006). Here, the record confirms the district court did not explicitly consider this factor.

Thus, we affirm Anderson's convictions, vacate the order assessing attorney fees against Anderson, and remand for reconsideration on that issue.

FACTS AND PROCEDURAL BACKGROUND

On the morning of October 3, 2020, McMillon was found dead in his home. He had been shot two times, with at least one of the gunshot wounds being fatal.

During their investigation, police obtained video surveillance footage from one of McMillon's neighbors. The video showed a man and two women entering McMillon's home around 12:33 a.m. on October 3 and leaving about seven minutes later. One of the women was carrying a TV on the way out. Police identified the two women in the video as Tishara Moran and Latrelle Praylow. And Moran and Praylow both identified the man as Anderson.

At trial, Moran and Praylow explained the events surrounding McMillon's murder. Moran testified she met and began dating Anderson in early September 2020. During their time together, Anderson sold synthetic marijuana, also known as K2 or tookie. McMillon was Anderson's supplier. McMillon would front K2 to Anderson, and

5

Anderson would repay McMillon after selling the supply. About a week before McMillon's murder, someone robbed Anderson, taking the K2 that McMillon had supplied to Anderson.

Anderson and Moran went to McMillon's home around 8:30 p.m. on the night of the murder and stayed for about 30 minutes. During that time, McMillon told Anderson several times that "I need my money," and Anderson responded, "I know." Moran believed they were talking about the money Anderson owed McMillon for the stolen K2.

About an hour or two before the murder, Praylow and Tony Hunter were in an SUV parked in an alley. They were met by Anderson and Moran, who were in Moran's car. Anderson got into the SUV with Praylow and Hunter. Praylow overheard Anderson say he knew where to get tookie, and Hunter said he wanted some. Praylow then got out of the SUV, leaving behind her bookbag which contained a .22 caliber gun.

Praylow got into Moran's car, and she and Moran smoked PCP in the car and talked for about 20 or 30 minutes. Anderson then returned to Moran's car and got in the driver's seat. The three of them returned to McMillon's.

Upon entering McMillon's home, McMillon greeted Praylow with a hug. Anderson then reached over Praylow's shoulder and shot McMillon. Praylow recognized the gun in Anderson's hand as the one from her bookbag. Anderson, Moran, and Praylow then went upstairs. Anderson ordered the women to look for items to steal. Praylow grabbed a TV and took it out to the car. Anderson drove them back to the alley where they had met up earlier that evening and dropped Praylow off. Anderson and Moran then went to a hotel with the TV still in Moran's car.

The next morning, Moran overheard Anderson talking on the phone in the bathroom. He kept saying he was "so sorry" and that he "fucked up." Moran said she had

6

little memory of what happened after smoking PCP the previous night. When she asked Anderson what had happened, he told her to tell the police he did it. She said she only later discovered that "it" was McMillon's murder.

After leaving the hotel, Anderson and Moran left the TV behind a dumpster. They then stopped at a sporting goods store and a pawn shop because Anderson kept saying he needed .22 caliber ammunition. At the pawn shop, Anderson pulled a gun out of his pocket. Moran later dropped Anderson off at a location in Topeka.

Moran was pulled over and arrested on a highway near Lawrence a few days after the murder. Two or three weeks later, Praylow flew to Washington under a different name and was eventually arrested in Seattle. Anderson was apprehended in Omaha, Nebraska in early January 2021.

Police found three .22 caliber casings in the living room of McMillon's home and one .22 caliber casing in the backseat of Moran's car. Forensic testing confirmed all four casings were fired from the same gun. But that gun was never recovered.

The week before Anderson's trial, Detective Victor Riggin with the Topeka Police Department discovered a recorded phone call Anderson made from jail in May 2021. During that call, Anderson talked about not getting a fair cut from drug sales and compared the listener's job frustrations to getting shorted in a drug deal. But Anderson made no reference to McMillon specifically. The recording was later admitted into evidence at trial.

As noted, the jury convicted Anderson on several counts. And the district court sentenced him to a controlling term of life without the possibility of parole for 620 months and ordered him to pay $5,000 in BIDS attorney fees.

Anderson appeals his convictions and the attorney fees order directly to our court. We heard oral argument on September 12, 2023. Jurisdiction is proper. K.S.A. 2022 Supp. 22-3601(b)(3)-(4) (life sentence and off-grid crimes appeal directly to Supreme Court).

ANALYSIS

I.   *The District Court Did Not Abuse Its Discretion by Declining to Exclude a Recording of the Jail Call as a Sanction for a Discovery Violation*

For his first issue on appeal, Anderson argues the district court abused its discretion by failing to exclude the recorded jail call as a sanction for the State's discovery violation. To resolve this issue, we first identify facts relevant to Anderson's challenge. Then, we identify the controlling legal framework governing the issue. Finally, we analyze the facts under that framework and conclude that Anderson has failed to carry his burden to show the district court abused its discretion.

A.   *Relevant Facts*

Anderson's trial began in February 2022. On the first day of trial, defense counsel informed the district court that three days earlier, the State had disclosed a recording of the jail call Anderson made in May 2021. Defense counsel confirmed that he had listened to the call with Anderson the previous day. The defense objected to its admission based on relevance and late disclosure. The State argued the evidence was relevant because it captured Anderson complaining about his share of the proceeds from a drug operation. As for the timing of the disclosure, the State said Detective Riggin did not start listening to Anderson's jail calls until the week before trial. And there was no unfair surprise to Anderson because the recording contained his own statements.

8

After listening to the recording, the district court ruled that the call was relevant and admissible. Defense counsel again objected, arguing the late disclosure prevented him from finding and interviewing the other person on the call. The court overruled the objection, stating, "[T]hese are the statements of your client. And your client's statements are fully discoverable by you." Anderson now argues the district court abused its discretion by failing to exclude the call as a sanction for a discovery violation.

B.  *Standard of Review and Relevant Legal Framework Governing This Discovery Issue*

"Generally, when a party challenges the admission or exclusion of evidence on appeal, the appellate court's first inquiry is relevance." *State v. Miller*, 308 Kan. 1119, 1174-75, 427 P.3d 907 (2018). But here, Anderson does not dispute the relevance of the jail call. Instead, he argues only that the district court should have excluded this evidence as a sanction for the State's discovery violation.

A district court's decision about whether to impose a sanction for a discovery violation, and which sanction to impose, is reviewed for an abuse of discretion, so long as due process rights are not implicated. 308 Kan. at 1175. And generally, defendants do not have a due process right to have evidence excluded when a party violates a discovery order. *State v. Johnson*, 286 Kan. 824, 832, 190 P.3d 207 (2008). "An abuse of discretion occurs if the decision is arbitrary, fanciful, or unreasonable, or if it is based on an error of law or fact." *State v. White*, 316 Kan. 208, 213, 514 P.3d 368 (2022). As the party asserting error, Anderson has the burden to establish an abuse of discretion. *State v. Genson*, 316 Kan. 130, 136, 513 P.3d 1192 (2022).

Anderson argues the State violated the discovery provisions of K.S.A. 2022 Supp. 22-3212. The statute requires that prosecutors permit defendants to inspect and reproduce certain types of evidence upon request, including recorded statements of the defendant

9

which are in the prosecution's "possession, custody or control" and which the prosecuting attorney knows about or might have learned about through the exercise of due diligence:

> "Upon request, the prosecuting attorney shall permit the defense to inspect and copy or photograph the following, if relevant: (1) Written or recorded statements or confessions made by the defendant, or copies thereof, which are or have been in the possession, custody or control of the prosecution, the existence of which is known, or by the exercise of due diligence may become known, to the prosecuting attorney." K.S.A. 2022 Supp. 22-3212(a).

"Discovery . . . must be completed no later than 21 days after arraignment or at such reasonable later time as the court may permit." K.S.A. 2022 Supp. 22-3212(h).

The statute also obligates parties to produce newly discovered evidence previously requested or subject to a prior discovery order. K.S.A. 2022 Supp. 22-3212(i). Failure to abide by this obligation may result in court-ordered sanctions. Such sanctions may include allowing the opposing party to inspect any materials not previously disclosed, ordering a continuance, or excluding any materials not disclosed:

> "If, subsequent to compliance with an order issued pursuant to this section, and prior to or during trial, a party discovers additional material previously requested or ordered which is subject to discovery or inspection under this section, the party shall promptly notify the other party or the party's attorney or the court of the existence of the additional material. If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this section or with an order issued pursuant to this section, the court may order such party to permit the discovery or inspection of materials not previously disclosed, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may enter such other order as it deems just under the circumstances." K.S.A. 2022 Supp. 22-3212(i).

10

The district court has wide discretion in deciding which, if any, sanctions to impose. *State v. Jones*, 209 Kan. 526, 528, 498 P.2d 65 (1972); see also *Johnson*, 286 Kan. at 832. In reaching this decision, the "trial court should take into account the reasons why disclosure was not made, the extent of the prejudice, if any, to the opposing party, the feasibility of rectifying that prejudice by a continuance, and any other relevant circumstances." *Jones*, 209 Kan. 526, Syl. ¶ 2. The court may also consider whether "there is a recurring problem or there are repeated instances of intentional failure to disclose or to abide by the court's discovery rulings." *State v. Winter*, 238 Kan. 530, 534, 712 P.2d 1228 (1986)."Ordinarily, the court should impose the least drastic sanctions which are designed to accomplish the objects of discovery but not to punish." 238 Kan. at 534.

### C. *Anderson Fails to Demonstrate the District Court Abused Its Discretion*

Anderson's claim of error is founded on the assumption that the State committed a discovery violation under K.S.A. 2022 Supp. 22-3212. And, in turn, this purported violation authorized the court to impose sanctions. But we question whether any discovery violation can be established on the record before us. See *Holmes v. State*, 292 Kan. 271, 280, 252 P.3d 573 (2011) (party asserting error has burden of furnishing record on appeal showing prejudicial error).

The State's failure to produce the jail call sooner does not, on its own, violate K.S.A. 2022 Supp. 22-3212. The statute requires the State to allow inspection and reproduction of evidence "[u]pon request." K.S.A. 2022 Supp. 22-3212(a). It is the party's request for inspection that triggers the prosecutor's statutory discovery obligations.

Anderson claims he entered a reciprocal discovery agreement with the State on May 26, 2021. But this agreement is not in the record on appeal. Nor does the record contain any other discovery request or order addressing the jail call. Without these

11

records, it is difficult to substantiate whether Anderson requested inspection or copies of the jail call or whether this evidence was otherwise subject to the district court's discovery orders.

Likewise, the record does not reveal any applicable deadlines for discovery. K.S.A. 2022 Supp. 22-3212(h) generally requires discovery to be completed no more than 21 days after arraignment, and Anderson waived formal arraignment on July 27, 2021. But the statute also authorizes the district court to order discovery to be completed more than 21 days after arraignment if the deadline is reasonable. K.S.A. 2022 Supp. 22-3212(h). The parties may also independently reach agreement on the time, place, and manner of criminal discovery. See K.S.A. 2022 Supp. 22-3212(f) (prosecuting attorney and defense "shall cooperate in discovery and reach agreement on the time, place and manner of making the discovery and inspection permitted"). And as previously noted, the criminal discovery statutes include a procedure for late discovery of information previously requested by a party. This statutory provision requires the discovering party to promptly notify the requesting party or the court of the newly discovered material. See K.S.A. 2022 Supp. 22-3212(i).

Here, we know the jail recording was disclosed only days before the trial. But it is difficult to assess the State's compliance with K.S.A. 2022 Supp. 22-3212 without record access to the discovery requests, orders, and agreements in this case. For these reasons, we merely assume (without deciding) that the State's failure to permit Anderson to inspect the recording of the jail call at some earlier date constituted a discovery violation under K.S.A. 2022 Supp. 22-3212. Even with this assumption, Anderson failed to carry his burden to show the district court abused its discretion.

K.S.A. 2022 Supp. 22-3212(i) grants the district court discretion to determine the "just" sanction for a discovery violation. See *Johnson*, 286 Kan. at 832. The failure to comply with a discovery request, while not to be condoned, "does not require the

12

evidence to be automatically excluded." *State v. Villa & Villa*, 221 Kan. 653, 656, 561 P.2d 428 (1977). Instead, a district court should normally impose the least drastic sanction needed to further the purpose of our discovery statutes—if the court imposes any sanction at all. See *Winter*, 238 Kan. at 534. The least drastic sanction contemplated under K.S.A. 2022 Supp. 22-3212(i) is an order requiring the noncompliant party to allow discovery and inspection of the materials previously requested but not disclosed.

Here, the district court's decision not to exclude the jail call recording from evidence was objectively reasonable. By the time the parties had raised the issue with the district court judge, the State had already produced a copy of the recording to Anderson, and he had reviewed it with counsel. In other words, the State had effectively imposed upon itself the least drastic sanction contemplated by K.S.A. 2022 Supp. 22-3212(i)— permitting inspection.

More severe or additional sanctions were not required to further the purposes of the criminal discovery statutes. There is no evidence suggesting the prosecutor acted in bad faith. Indeed, the State turned the recording over to Anderson shortly after learning of its existence. See *Johnson*, 297 Kan. at 216-17 (absence of bad faith and intentional violation of discovery mitigates against more severe sanctions). And the admission of this evidence produced no undue surprise or prejudice to Anderson. He made the phone call and had actual knowledge of the contents of the recording from the outset. See *Jones*, 209 Kan. at 531 (absence of surprise weighed against imposing harsher sanctions for discovery violation).

Under these circumstances, the district court reasonably decided not to exclude the recording of the jail call from evidence. Anderson has failed to demonstrate that the district court exceeded its wide discretion in resolving this issue.

II. *The Prosecutor Committed Error During Rebuttal Closing Argument, but This Error Did Not Affect the Outcome of the Trial*

Second, Anderson argues the prosecutor committed error during closing argument by shifting the burden of proof. As with the prior issue, we first address the facts and controlling legal framework before outlining our rationale for concluding that any prosecutorial error was harmless.

A. *Additional Facts About the Closing Argument*

While in jail before Anderson's trial, Moran and Praylow exchanged several letters in which they discussed information related to the case. At trial, defense counsel elicited testimony from Detective Riggin that some of those letters appeared to contain more than one person's handwriting. This led Riggin to believe Praylow may have been forging letters to fabricate evidence, and Riggin sent an email informing the prosecutor of his suspicions. Riggin also said the letters mentioned Hunter—the man in the SUV with Praylow on the night of the murder. The allegedly forged letters were not admitted into evidence, though the State did admit two other letters written by Moran to Praylow.

During closing argument, defense counsel argued the State's case relied heavily on assumptions and conjecture. Defense counsel highlighted weaknesses in the State's case, such as inconsistencies between Praylow's testimony and the physical evidence; the State's failure to identify a bystander depicted in the surveillance video; and the absence of Anderson's DNA in McMillon's home. Defense counsel argued the State was asking the jury to "fill in the blanks" or "read between the lines" despite a lack of evidence supporting the State's case.

Defense counsel also challenged Moran's and Praylow's credibility. He pointed out the news had broadcast information about the investigation which Moran and Praylow

may have heard before they gave statements to police. He also emphasized that Moran and Praylow had exchanged information about the case through letters, and those letters mentioned Hunter. Defense counsel suggested Moran and Praylow may have simply pinned the murder on Anderson to help themselves or to help the real culprit evade responsibility.

In rebuttal, the prosecutor made the following comments:

"[T]here's been talk about letters throughout the course of this case. Well you guys were writing letters back and forth, right? These women were in the jail, they were writing letters, those letters mentioned [Hunter], didn't they? Now you haven't seen the letters, and this is another important point.

"*If there is a piece of evidence that would prove or would show that . . . there's a reasonable doubt as to the defendant's guilt, the defendant has the same subpoena power that the State has. The defendant can call witnesses to come in here to bring in evidence and to show you things. And if there is some letter out there that indicates that these women are lying or if they—*" (Emphasis added.)

Defense counsel objected on the grounds of burden-shifting. The State responded, "What I have said has been recognized by the Kansas Supreme Court as an appropriate argument when the defense makes the argument that the State has failed to present some piece of evidence." The district court told the prosecutor, "I do believe you're going to get to burden shift. And at this point in time, I would ask that you just move on with this." The State did not return to this line of argument.

On appeal, Anderson argues that the highlighted statements above improperly suggested Anderson had the burden to disprove the State's case or that a finding of reasonable doubt is contingent on production of evidence by the defense.

15

B. *Standard of Review and Legal Framework for Prosecutorial Error*

To determine whether prosecutorial error has occurred, this court considers whether the challenged prosecutorial acts "fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial." *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). If error is found, this court then determines whether that error prejudiced the defendant's right to a fair trial by considering whether the State can prove beyond a reasonable doubt that the error did not contribute to the verdict. 305 Kan. at 109.

Prosecutors generally have wide latitude in crafting arguments and commenting on the weaknesses of the defense. *State v. Bodine*, 313 Kan. 378, 406, 486 P.3d 551 (2021); *State v. Williams*, 299 Kan. 911, 934, 329 P.3d 400 (2014). But an argument attempting to shift the burden of proof is improper. 299 Kan. at 939. The challenge lies in identifying the line between a prosecutor's proper comments on a defense or defendant's evidence and improper burden-shifting.

"[A] prosecutor does not shift the burden of proof by pointing out a lack of evidence to support a defense or to corroborate a defendant's argument regarding holes in the State's case." 299 Kan. at 940. Likewise, "[w]hen the defense creates an inference that the State's evidence is not credible because the State failed to admit a certain piece of evidence, the State may rebut the inference by informing the jury that the defense has the power to introduce evidence." *State v. Blansett*, 309 Kan. 401, 415, 435 P.3d 1136 (2019). But when discussing the defense's subpoena power, the State crosses the line when it suggests the defendant must disprove the State's case or offer evidence to support a finding of reasonable doubt. 309 Kan. at 415; *Williams*, 299 Kan. at 939.

C. *The Rebuttal Argument Fell Outside the Wide Latitude Afforded to Prosecutors, but the Error is Harmless*

The State maintains defense counsel's closing argument gave the prosecution leeway to comment on Anderson's subpoena power. That is, defense counsel's closing argument focused on evidence the State had failed to produce, so the State could permissibly argue that Anderson had the ability to produce any evidence favorable to him. But we disagree with the State's characterization of its rebuttal argument.

The State did not simply point out that Anderson had the power to present evidence favorable to the defense. Rather, the State's argument coupled the defense's subpoena power with the reasonable doubt standard. It argued: "If there is a piece of evidence that *would prove or would show that . . . there's a reasonable doubt as to the defendant's guilt*, the defendant has the same subpoena power that the State has." (Emphasis added.)

This statement would have sent a mixed message to the jury regarding the burden of proof—it suggested Anderson had the burden to present evidence before the jury could find reasonable doubt as to his guilt. And the State's argument incorrectly faulted the defense for not producing "some letter . . . that indicates that [Moran and Praylow] are lying." Taken together, these comments suggested that Anderson had the burden to prove Moran and Praylow were not credible witnesses. And they further implied that Anderson had failed to carry this burden because he did not produce the allegedly forged letters.

In other contexts, we have permitted the State to discuss the defense's failure to produce specific evidence. For example, in *Blansett*, defense counsel emphasized during closing argument that the State had introduced a recording of only one of the defendant's multiple interviews with police. Defense counsel suggested the State was hiding the recordings of the other interviews because they were favorable to the defense. In rebuttal,

17

the State argued the defense had the same power and ability to introduce those recordings into evidence. We held the State's response "fell within the wide latitude to refute the inference that it was hiding evidence from the jury, and it did not suggest the defense bore the burden to disprove the crimes charged." *Blansett*, 309 Kan. at 415.

We have reached the same conclusion under similar circumstances in other decisions. See *State v. Pribble*, 304 Kan. 824, 837-38, 375 P.3d 966 (2016) (prosecutor's comment that defendant could have called alibi witnesses was fair rebuttal to defense counsel's argument that State failed to call witnesses who could corroborate defendant's account); *State v. Naputi*, 293 Kan. 55, 64, 260 P.3d 86 (2011) (it was not improper for the State to respond to defense counsel's "purported inference" that the State refused to call a witness beneficial to the defense "by pointing out that if the [witness] would have been helpful to the defense, the defense could have subpoenaed him").

But "the line between permissible and impermissible argument is [often] context dependent." *State v. Martinez*, 311 Kan. 919, 923, 468 P.3d 319 (2020). And here, the context distinguishes *Blansett*, *Pribble*, and *Naputi* because defense counsel never faulted the State for failing to introduce the allegedly forged letters. Nor did defense counsel ask the jury to infer the letters would have been favorable to the defense because the State failed to present them. Thus, the State's comment regarding Anderson's failure to produce the letters cannot be characterized as fair rebuttal to any suggested inference.

After considering the unique factual circumstances of this trial and placing both parties' closing arguments in context, we hold that the rebuttal argument fell just outside the wide latitude afforded prosecutors in arguing a case. The prosecutor's comments implied that the burden was on Anderson to rebut the State's witnesses and establish a reasonable doubt as to his guilt. Similarly, they suggested Anderson failed to carry this

18

burden because he did not subpoena the allegedly forged letters. So construed, the argument falls within the category of burden-shifting, which we have consistently deemed improper. See *Blansett*, 309 Kan. at 414; *Williams*, 299 Kan. at 939.

Having concluded there was error, we must now consider whether that error was harmless—that is, whether it prejudiced Anderson's due process rights to a fair trial. *State v. Thomas*, 311 Kan. 905, 910, 468 P.3d 323 (2020). In doing so, we apply the traditional constitutional harmlessness standard identified in *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). *Sherman*, 305 Kan. at 109. Under this standard, "prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.'" 305 Kan. at 109 (quoting *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 [2011]).

The State has met its burden to show beyond reasonable doubt that this prosecutorial error did not affect the outcome of the trial. For one, the State's comments were isolated. See *State v. Hirsh*, 310 Kan. 321, 343, 446 P.3d 472 (2019) (prosecutorial error harmless in part because prosecutor's improper comment "was singular and isolated"). Defense counsel objected just after the prosecutor made the challenged remarks. The district court advised the prosecutor to move on because the argument sounded like burden-shifting. And the State complied with this admonishment.

The State also acknowledged during rebuttal that the law places the burden of proof on the State, not the defendant:

> "In this case, the State has the burden of proof; that's the way he [*sic*] works a [*sic*] criminal cases. The defendant is not required to prove that he is innocent. The State must prove that the defendant is guilty."

And while the State's argument may have erroneously suggested Anderson carried the burden to prove Praylow and Moran were lying, the parties' closing arguments made clear the determination of those witnesses' credibility was ultimately up to the jury. The jury instructions reinforced this message. The court instructed jurors that "[i]t is for you to determine the weight and credit to be given the testimony of each witness." The jury also received an accomplice witness instruction, stating it "should consider with caution the testimony of an accomplice who may receive a benefit from the State for her testimony." We presume the jury followed these instructions. *State v. Thurber*, 308 Kan. 140, 194, 420 P.3d 389 (2018). Thus, we hold that the prosecutorial error is harmless.

III. *The State Presented Sufficient Evidence to Support Anderson's Conviction for Distributing or Possessing with Intent to Distribute a Controlled Substance*

In his third issue on appeal, Anderson argues there was insufficient evidence to convict him of distributing K2 or possessing K2 with intent to distribute.

A. *The State's Evidence*

At trial, Moran testified Anderson was selling K2 often in September 2020. She explained K2 and tookie were the same substance—synthetic marijuana. She described its appearance as "green" and "kind of like a potpourri." She also explained the arrangement between Anderson and McMillon. McMillon would front K2 to Anderson, and Anderson would repay McMillon after selling it. She recalled being in the car with Anderson while he was delivering drugs in Topeka. And she once picked up some K2 from McMillon's home and took it to Anderson in Kansas City. Moran testified that about a week before the murder, Anderson had been robbed of K2 that he received from McMillon. And, on the day of the murder, McMillon had repeatedly requested payment.

20

The State also presented a message sent from Moran's phone on September 21, 2020, stating: "[McMillon's address], please go to my cousin's spot and he'll give you some smoke for me. I told him you would pull up. Just video call me when you get there." Moran denied writing this message, explaining that Anderson sometimes had access to her phone.

Another State's witness, Rachel Johnson, testified that "probably a month or two" before the shooting—that is, in August or September 2020—she bought K2 from McMillon, and Anderson had delivered the substance to her home. Johnson also went to McMillon's home to buy K2 the morning after the murder but left when nobody answered the door.

Praylow testified she heard Anderson say he knew where to get some tookie while she was in the SUV with Anderson and Hunter on the night of the murder.

Finally, during a search of McMillon's home following the murder, police found 162.45 grams of marijuana and 168.73 grams of K2 in the kitchen along with some scales and plastic baggies. Chemical analysis confirmed the substances were marijuana and K2.

B. *Standard of Review and Relevant Legal Framework*

When reviewing the sufficiency of the evidence to support a conviction, this court looks at all the evidence in the light most favorable to the State to decide whether a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. In doing so, we do not reweigh evidence, resolve evidentiary conflicts, or reassess witness credibility. *State v. Spencer*, 317 Kan. 295, 302, 527 P.3d 921 (2023).

Anderson was charged with distributing or possessing with intent to distribute marijuana or synthetic marijuana in an amount less than 25 grams under K.S.A. 2020 Supp. 21-5705(a)(4) and (d)(2)(A). The jury instructions told the jury that to convict for this offense the State must prove:

"1.   The defendant distributed or possessed with intent to distribute marijuana or an analog thereof, and/or synthetic marijuana also known as 'K2' or 'Tookie' also known as Methyl 2-{[1-(pente-1-yl) – 1H-indazol-3-yl) carbonyl]amino} – 3,3-dimethylbutanoate (MDMB-en-PINCACA) a controlled idazole-3 carboximide.

"2.   The quantity of 'K2' or 'Tookie' distributed or possessed with intent to distribute was less than 25 grams.

"3.   This act occurred on or about the 1st day of September through the 3rd day of October, 2020 in Shawnee County, Kansas."

C.   *There Was Sufficient Evidence to Sustain a Conviction for Distribution of Less Than 25 Grams of Synthetic Marijuana*

Anderson first challenges the sufficiency of the evidence on the grounds that no witness testified he distributed K2 on a specific date. But Anderson was charged with distribution "[o]n or about the 1st of September, 2020 through the 3rd of October, 2020." Moran's testimony establishes she met Anderson in early September and was in a romantic relationship with him at least through the date of McMillon's murder on October 3. She also detailed Anderson's extensive distribution activity during that time. This activity was corroborated by Johnson, who testified Anderson delivered K2 to her a month or two before the murder—that is, in August or September 2020. Any date discrepancy in this testimony would go to its weight, and we do not reweigh evidence when conducting sufficiency review. See *Spencer*, 317 Kan. at 302. This evidence is sufficient to establish that Anderson distributed K2 within the relevant date range.

22

Next, Anderson argues the State presented no evidence establishing the amount of K2 he distributed. The amount distributed is relevant because the severity level of the offense of distribution of marijuana or an analog of marijuana is graded by the quantity of material distributed. See K.S.A. 2022 Supp. 21-5705(d)(2). But the lowest severity level of that offense involves distribution of less than 25 grams. See K.S.A. 2022 Supp. 21-5705(d)(2)(A). And the State charged Anderson under subsection (d)(2)(A). Thus, evidence that Anderson distributed any quantity of K2 would suffice to establish this element. See, e.g., *State v. Scheuerman*, 314 Kan. 583, 592, 502 P.2d 502 (2022) (undisputed evidence of possession of greater quantity of controlled substance than charged crime encompasses is sufficient to establish possession of amount of charged crime).

Finally, Anderson argues there is insufficient evidence to establish the substance he was distributing was K2. Anderson acknowledges the State may prove the identity of a controlled substance through circumstantial evidence if that evidence supports a reasonable inference that the defendant distributed or possessed the substance in question. See *United States v. Baggett*, 890 F.2d 1095, 1096 (10th Cir. 1989); *State v. Northrup*, 16 Kan. App. 2d 443, 452-53, 825 P.2d 174 (1992). Such evidence may include: (1) evidence regarding the physical appearance of the substance; (2) evidence that the substance produced the expected affect when tested by someone familiar with the illegal drug; (3) evidence the substance was used in the same way as the illicit drug; (4) evidence that a high price was paid in cash for the substance; (5) evidence that transactions involving the substance were carried out in secrecy; and (6) evidence that the substance was called by the name of the illegal drug by the defendant or others in his presence. *Baggett*, 890 F.2d at 1096; *Northrup*, 16 Kan. App. 2d at 453.

Anderson argues the circumstantial evidence at trial does not support an inference the substance he distributed was K2. Our review of the record convinces us otherwise. Moran testified Anderson distributed K2, which she explained was synthetic marijuana.

23

She also described the substance's appearance as consistent with synthetic marijuana. Johnson, an experienced consumer, testified Anderson delivered K2 to her. Praylow testified she heard Anderson say he knew where to get tookie, which Moran explained is another term for K2 or synthetic marijuana. Finally, the evidence showed McMillon was Anderson's supplier, and chemical analysis of substances recovered from McMillon's home confirmed they were marijuana and synthetic marijuana.

Viewing this evidence in a light most favorable to the State, as we must under the controlling standard of review, the evidence is sufficient to establish that Anderson distributed less than 25 grams of synthetic marijuana on or about September 1 through October 3, 2020. We thus affirm his conviction for this offense.

IV. *The District Court Erred by Ordering Anderson to Pay $5,000 in BIDS Attorney Fees Without Expressly Considering the Nature of the Burden That Payment Would Impose*

Finally, Anderson argues the district court erred by failing to comply with K.S.A. 22-4513 when imposing BIDS attorney fees. The statute provides that a district court shall tax a convicted defendant with all expenditures made by BIDS in providing counsel and other defense services. K.S.A. 22-4513(a). When determining the amount and method of payment, district courts must explicitly consider two circumstances on the record: (1) the financial resources of defendant; and (2) the nature of the burden that payment of the award will impose. K.S.A. 22-4513(b); *Robinson,* 281 Kan. at 546.

At sentencing, the State requested the district court require Anderson to reimburse BIDS attorney fees in the amount of $10,225 or to ask about Anderson's ability to pay those fees. The district court later asked if Anderson had any income from any source, and Anderson responded he did not. The court then imposed "a reduced attorney fee in the amount of $5,000 as opposed to [$]10,225 for indigency found."

24

The district court expressly considered Anderson's financial resources on the record. But both parties agree the district court did not expressly consider the nature of the burden that payment of the award would impose on Anderson. Thus, we vacate the district court's order assessing Anderson with BIDS attorney fees and remand for reconsideration on this issue. See *State v. Garcia-Garcia*, 309 Kan. 801, 824, 441 P.3d 52 (2019) (vacating BIDS attorney fees assessment and remanding for reconsideration of defendant's obligation).

## CONCLUSION

None of the issues Anderson raised on appeal warrant reversal of his convictions. The district court's decision to admit the jail call was reasonable under the circumstances. While the State's rebuttal closing argument fell outside the bounds of proper argument, that error was harmless. And sufficient evidence supports Anderson's conviction for distributing K2. We thus affirm all Anderson's convictions.

But the district court erred by taxing Anderson with BIDS attorney fees without first expressly considering on the record the burden that payment would impose. We thus vacate that order and remand for reconsideration of the attorney fee issue.

Judgment of the district court is affirmed in part, vacated in part, and remanded for further proceedings consistent with this opinion.